**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BRENDA JONSSON, individually and on
behalf of all others similarly situated,

                Plaintiff,

     v.

USCB, INC., a California corporation d/b/a
USCB AMERICA,

                Defendant.

Case No. CV 13-8166 FMO (SHx)

**ORDER PRELIMINARILY APPROVING
CLASS ACTION SETTLEMENT AND
CLASS NOTICE, AND SETTING FINAL
FAIRNESS HEARING**

Having reviewed and considered all the briefing filed with respect to plaintiff Brenda Jonsson's ("Jonsson" or "plaintiff") renewed Motion for Preliminary Approval of Class Action Settlement ("Motion"), and the oral argument presented to the court on October 16, 2014, and January 8, 2015, the court rules as follows.

## INTRODUCTION

Plaintiff filed this class action against defendant USCB, Inc., d/b/a USCB America ("USCB" or "defendant") on November 5, 2013, asserting causes of action for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, et seq. (See Complaint at ¶¶ 32-46). On May 29, 2014, plaintiff filed a First Amended Complaint ("FAC"), reasserting the TCPA and FDCPA claims, (see FAC at ¶¶ 36-53), and adding a claim pursuant to California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal. Civ. Code §§ 1788, et seq. (See id. at ¶¶ 54-60).

This matter first came before the court on October 16, 2014, on plaintiff's motion for preliminary approval of class action settlement. The court denied preliminary approval at that time, and ordered the parties to file a renewed motion with additional briefing and supporting evidence, and to correct deficiencies in the proposed settlement agreement. (See Court's Order of October 16, 2014). Plaintiff filed her renewed motion for preliminary approval on November 17, 2014. USCB filed a Notice of Non-Opposition to Plaintiff's Motion for Preliminary Approval of Class Action Settlement. ("Non-Opp.").

In her unopposed Motion, plaintiff seeks an order: (1) preliminarily approving the proposed settlement; (2) certifying the proposed class for settlement purposes; (3) approving the form and content of the proposed notice to class members; (4) appointing Jonsson as class representative; (5) appointing class counsel; and (6) scheduling a Final Fairness Hearing. (See Notice of Plaintiff's Motion for Preliminary Approval of Class Action Settlement ("Notice of Motion") at 2).

## BACKGROUND

I.   FACTUAL ALLEGATIONS.

Plaintiff and the putative class members are individuals residing within the United States who allege that they received unauthorized and mistaken automated calls from defendant to their cellular phones in an attempt to collect outstanding debts. (See FAC at ¶¶ 3, 12-15 & 26).

Plaintiff alleges that USCB, a debt-collector, (see FAC at ¶ 6), contacts debtors and third parties by telephone in connection with consumer debts and that many of the calls are "made to numbers assigned to cellular telephones." (Id. at ¶ 11). Through third parties Five9, Inc. ("Five9") and Global Connect, L.L.C. ("Global Connect"), (see id. at ¶ 23), USCB utilizes automatic dialing and artificial/prerecorded voice technology to make such calls. (See id. at ¶¶ 22-23). For many consumers who received such calls during the class period, USCB acquired their telephone numbers through "skip tracing" or other indirect method, rather than from the individual consumer. (See id. at ¶ 14).

According to plaintiff, USCB repeatedly made such calls to plaintiff's cellular phone in an attempt to collect a debt she did not owe. (See FAC at ¶¶ 16-17). Indeed, the calls made reference to a person whose name plaintiff has never used or heard. (See id. at ¶¶ 18-19).

Plaintiff called USCB "at the (855) 233-6432 number provided in some of its messages as a number to contact if USCB had called the wrong person" to request that it discontinue calling her telephone number.  (See id. at ¶ 24).  Despite her request, USCB continued to call plaintiff using "an autodialer and/or artificial or prerecorded voice."  (Id.).

Plaintiff alleges that USCB violated the TCPA by using autodialers and an artificial or prerecorded voice in "calls to the cell phones of Plaintiff and the other members of the Class." (FAC at ¶¶ 39-41).  Plaintiff also alleges that USCB violated the FDCPA's prohibition against "threat[ening] to take any action that cannot legally be taken or that is not intended to be taken[,]" (id. at ¶¶ 50-51) (internal quotation marks omitted) (first alteration in original), by telling recipients of the calls "to call (855) 233-6432 if Defendant had called the wrong number, so that the called party's telephone number could be removed from the list of numbers to be called."  (Id. at ¶ 51). According to plaintiff, "[i]mplicit in this message is the threat that, unless the consumer takes the affirmative step of calling Defendant and notifying it of the wrong number or indirectly requesting that the calls stop, Defendant will continue to make its autodialed and/or artificial or prerecorded voice calls to the consumer's phone, in violation of . . . the TCPA." (Id.).  "As such, Defendant's threat to continue making illegal autodialed and/or artificial or prerecorded voice calls in violation of the TCPA constituted a threat to take any action that cannot legally be taken[,] in further violation of Section 1692e(5) of the FDCPA."  (Id.) (internal quotation marks omitted) (alteration in original).  USCB's alleged violations of the TCPA and FDCPA, in turn, constituted a violation of the Rosenthal Act.  (See id. at ¶¶ 54-60).

II.   SETTLEMENT AGREEMENT.

On May 19, 2014, the parties participated in a day-long court-ordered mediation.  (See Motion, Exhibit ("Exh.") B (Declaration of Plaintiff's Attorney Lance A. Raphael in Support of Motion for Preliminary Approval of Class Action Settlement ("Raphael Decl.")) at ¶ 41).  On July 24, 2014, the parties attended a second day-long mediation before the Honorable Carl J. West (ret.), during which an agreement in principal was reached.  (See id. at ¶¶ 44-45; Notice of Motion, Exh. 1 (Class Action Settlement Agreement) ("Settlement Agreement") at § A(21)).  The parties continued to negotiate the terms of the settlement for six weeks after the mediation before Judge West.  (See

1   Raphael Decl. at ¶ 45).

2   Following the court's denial of plaintiff's first motion for preliminary approval, (see Court's

3   Order of October 16, 2014), the parties negotiated an amendment to the terms of the settlement.

4   (See Raphael Decl. at ¶ 46).  The material terms of the Settlement Agreement are as follows.

5   A.   Class Definition.

6   The proposed settlement class is defined by the parties as:

7          All persons in the United States whose cellular telephone number, at any

8          time between November 5, 2009 and May 15, 2014, Defendant or another

9          on its behalf called using an artificial or prerecorded voice and/or equipment

10         with the capacity to dial numbers without human intervention, where the

11         person owning the number called was not the person that Defendant

12         intended to call or not a person who had consented to receiving such calls.

13  (Settlement Agreement at § C(1); Motion at 5).

14  B.   Settlement Benefits.

15  The Settlement Agreement requires USCB to pay $2,750,000 into a Settlement Fund,  (see

16  Settlement Agreement at §§ B(35) & D(1)), which is 91.6% of the applicable insurance policy limit.

17  (See Motion at 6).  From the $2.75 million Settlement Fund, the Settlement Agreement provides

18  for payment of notice and administration costs, which shall not exceed $394,000, (see Settlement

19  Agreement at § D(1)(a)), an incentive award to the class representative of no more than $10,000,

20  (see id. at § D(1)(b)), attorney's fees equal to 30% of the Settlement Fund (i.e., $825,000), and

21  out-of-pocket costs and expenses not to exceed $50,000.  (See id. at § D(1)(c)).  The remaining

22  monies in the Settlement Fund will be distributed on a pro rata basis to class members who submit

23  timely and valid claim forms.  (See id. at § D(1)(d)).  Should the court award less than the

24  expected or requested notice and administration costs, attorney's fees and costs, and incentive

25  award, the funds shall remain in the Settlement Fund for distribution to the class. (See id.).  Any

26  funds remaining from checks left uncashed after 120 days after mailing will be distributed, subject

27  to the court's approval, to the National Consumer Law Center in Boston, Massachusetts, as a cy

28  pres recipient.  (See id. at § D(1)(e)).

4

According to plaintiff, a minimum of $1,472,000 of the Settlement Fund will be available for distribution to the class members.  (See Motion at 10 & 12; Raphael Decl. at ¶ 47).  Plaintiff's counsel represents that he "reviewed reports of claims rates in other similar settlements, with similar notice plans, and anticipate[s] that the claims rate will be within the . . . range of 3-10%[,]" (Raphael Decl. at ¶ 52), which will result in individual class member awards ranging from $47 to $158.  (See Motion at 12).

The Settlement Agreement also provides prospective relief to the class by requiring USCB to partner, for a five year period, with Neustar, a company that employs realtime scrubbing services on all telephone numbers placed into a call database, to determine whether a number is a cellular phone number.  (See Settlement Agreement at § D(2)).  If the telephone number is determined to be a cellular phone number, Neustar will analyze whether the name of the debtor on the account assigned for collection is the same name associated with its scrub results.  (See id.).  If the names do not match, USCB will remove the number from its dialing system.  (See id.).  According to USCB's Vice President and Compliance Officer, the estimated cost of implementing this procedure is approximately $315,000.  (See Motion, Exh. G (Declaration of Sean Escobar Regarding Costs Incurred By USCB, Inc. in Connection with Prospective Relief) at ¶ 5).  If USCB breaches this provision of the Settlement Agreement and fails to cure following notice by plaintiff, plaintiff will be entitled to seek an order "to enforce the injunctive relief aspects of th[e Settlement] Agreement and will be entitled to any and all reasonable attorneys' fees and costs incurred in enforcing" the Settlement Agreement.  (See Settlement Agreement at § D(2)).

C.      Scope of Release.

Upon final approval of the Settlement Agreement, class members who did not validly opt out the settlement will release claims arising under the TCPA, the FDCPA, and the Rosenthal Act, "that were asserted or arise from the facts alleged in the Complaint and [FAC] . . . and that relate to Defendant making or causing to be made autodialed and/or prerecorded or artificial voice calls to the Settlement Class Members' cellular phones between November 5, 2009 and May 15, 2014." (Settlement Agreement at § D(3)(a)).  The release does not "release any alleged debts owed to Defendant or the original creditor for whom [USCB] was attempting to collect the alleged debt or

1    impact Defendant's rights to take action to collect." (Id. at § D(3)(b)).  Nor does the release "impair

2    or limit any right or cause of action by the [class members] to dispute . . . debts or by [USCB] to

3    collect such debts."  (Id. at § B(31)).  Finally, the release is to "be construed to exclude, and shall

4    not impair, any claims currently pending against Defendant in any court of competent jurisdiction

5    or any arbitral forum as of the date of the Preliminary Approval Order."  (Id. at § D(3)(a)).

6        Plaintiff Jonsson and USCB agreed to a more comprehensive release.  Specifically, upon

7    final approval of the settlement, they will be deemed to have "expressly waived the provisions,

8    rights and benefits of any statute, rule or provision which prohibits the release of unknown claims

9    by and between Brenda Jonsson and USCB, including California Civil Code § 1542[.]" (Settlement

10   Agreement at § D(3)(d)).

11                                          **LEGAL STANDARD**

12       "[I]n the context of a case in which the parties reach a settlement agreement prior to class

13   certification, courts must peruse the proposed compromise to ratify both the propriety of the

14   certification and the fairness of the settlement."  Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir.

15   2003).

16   I.    CLASS CERTIFICATION.

17       "Parties seeking class certification for settlement purposes must satisfy the requirements

18   of Federal Rule of Civil Procedure 23[.]"[1]  Sandoval v. Roadlink USA Pacific, Inc., 2011 WL

19   5443777, *2 (C.D. Cal. 2011) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117

20   S.Ct. 2231, 2248 (1997)).  "A court considering such a request should give the Rule 23 certification

21   factors 'undiluted, even heightened, attention in the settlement context.'"  Id. (quoting Amchem,

22   521 U.S. at 620, 117 S.Ct. at 2248).  "Such attention is of vital importance, for a court asked to

23   certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the

24   class, informed by the proceedings as they unfold."  Amchem, 521 U.S. at 620, 117 S.Ct. at 2248.

25       A party seeking class certification must first demonstrate that: "(1) the class is so numerous

26

27   _____

28       [1]  All further "Rule" references are to the Federal Rules of Civil Procedure unless otherwise
     indicated.

                                                    6

that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548 (2011).  Rule 23(b) is satisfied if:

>  (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>>  (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>>  (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
>  (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
>  (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>>  (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>>  (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>>  (C) the desirability or undesirability of concentrating the litigation of the

1    claims in the particular forum; and

2            (D) the likely difficulties in managing a class action.

3    Fed. R. Civ. P. 23(b)(1)-(3).

4    II.    FAIRNESS OF CLASS ACTION SETTLEMENT.

5        Rule 23 provides that "the claims, issues, or defenses of a certified class may be settled

6    . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "The primary concern of [Rule 23(e)]

7    is the protection of th[e] class members, including the named plaintiffs, whose rights may not have

8    been given due regard by the negotiating parties."  Officers for Justice v. Civil Service Com., 688

9    F.2d 615, 624 (9th Cir. 1982), cert. denied 459 U.S. 1217 (1983).  Accordingly, a district court

10   must determine whether a proposed class action settlement is "fundamentally fair, adequate, and

11   reasonable."  Staton, 327 F.3d at 959; see Fed. R. Civ. Proc. 23(e).  Whether to approve a class

12   action settlement is "committed to the sound discretion of the trial judge."  Class Plaintiffs v. City

13   of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied sub nom., Hoffer v. City of Seattle, 506

14   U.S. 953 (1992) (internal quotation marks and citation omitted).

15       "If the [settlement] proposal would bind class members, the court may approve it only after

16   a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In

17   order to approve a settlement in a class action, the court must conduct a three-step inquiry.  First,

18   it must assess whether defendant has met the notice requirements under the CAFA.  See 28

19   U.S.C. § 1715(d).  Second, it must determine whether the notice requirements of Federal Rule of

20   Civil Procedure 23(c)(2)(B) have been satisfied.  Finally, it must conduct a hearing to determine

21   whether the settlement is fair, reasonable, and adequate.  See Fed. R. Civ. P. 23(e)(2); Staton,

22   327 F.3d at 959; Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d. 964 (E.D. Cal. 2012)

23   (conducting three-step inquiry).

24       For purposes of preliminary approval of a proposed class action settlement, the court "must

25   evaluate the terms of the settlement to determine whether they are within a range of possible

26   judicial approval."  Wright v. Linkus Enters., Inc., 259 F.R.D. 468, 472 (E.D. Cal. 2009).  The court

27   should preliminarily approve the settlement as long as a "preliminary evaluation of the proposed

28   settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as

8

unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval[.]"  In re Vitamins Antitrust Litig., 2001 WL 856292, *4  (D.D.C. 2001) (quoting Manual for Complex Litigation, Third, § 30.41  (West 1999)).  At this stage, the court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) falls within the range of possible approval; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) has no obvious deficiencies.  See Harris v. Vector Mktg. Corp., 2011 WL 1627973, * 7 (N.D. Cal. 2011); Alvarado v. Nederend, 2011 WL 90228, *5 (E.D. Cal. 2011) (same).  "Closer scrutiny is reserved for the final approval hearing."  Harris, 2011 WL 1627973, at *7; see In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011) (setting forth eight factors to be examined by the court in determining final approval of settlement).

**DISCUSSION**

I.    CONDITIONAL CLASS CERTIFICATION.

    A.    Rule 23(a) Requirements.

        **1.    Numerosity.**

The first prerequisite of class certification requires a plaintiff to establish that the class is "so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  "[T]he plaintiff need not show that it would be 'impossible' to join every class member."  Sandoval, 2011 WL 5443777, at *4.  Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers."  See Jordan v. L.A. County, 669 F.2d 1311, 1319 (9th Cir.), vacated on other grounds, 459 U.S. 810 (1982) (class sizes of 39, 64, and 74 are sufficient to satisfy the numerosity requirement).  "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when membership dips below 21."  Slaven v. BP America, Inc, 190 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 473 (C.D. Cal. 2012).

Here, "USCB's records indicate that it used its Five9 and Global Connect dialers to make calls playing prerecorded voice messages to 621,278 unique cellular telephone numbers." (Motion

1  at 15; see id., Exh. C (Declaration of David A. Christopherson Regarding Identification of Cellular

2  Telephone Numbers) ("Christopherson Decl.") at ¶ 22).  The class, which is a subset of the

3  number set forth above, (see Motion at 15), is far beyond 40 members, and thus readily meets the

4  numerosity requirement.

5          **2.      Commonality.**

6          To show commonality, a plaintiff "must demonstrate that there are questions of fact and law

7  that are common to the class." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 981 (9th Cir. 2011)

8  (citing Fed. R. Civ. P. 23(a)(2)).  "'Where the circumstances vary but retain a common core of

9  factual or legal issues with the rest of the class, commonality exists.'" Evon v. Law Offices of

10 Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting Parra v. Bashas', Inc., 536 F.3d 975,

11 978-79 (9th Cir. 2008); Ellis, 657 F.3d at 981 ("The requirements of Rule 23(a)(2) have been

12 construed permissively, and all questions of fact and law need not be common to satisfy the

13 rule.").  Indeed, "for purposes of Rule 23(a)(2) even a single [common] question will do." Dukes,

14 131 S.Ct. at 2556.

15         "Commonality exists when there is either a common legal issue stemming from divergent

16 factual predicates or a common nucleus of facts resulting in divergent legal theories." Barbosa

17 v. Cargill Meat Solutions Corp., 297 F.R.D. 431, 441 (E.D. Cal. 2013) (citing Hanlon v. Chrysler

18 Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)).  "As clarified in [Dukes], a plaintiff must demonstrate

19 that the class members 'have suffered the same injury' and that their claims 'depend upon a

20 common contention . . . of such a nature that [it] is capable of classwide resolution – which means

21 that determination of its truth or falsity will resolve an issue that is central to the validity of each

22 one of the claims in one stroke.'" Id. (quoting Dukes, 131 S.Ct. at 2551).

23         Here, there are common questions of fact and law arising from defendant's alleged

24 common practice of "using an [automated dialing system] and/or artificial or prerecorded voice"

25 in calls to the class members' cellular telephone numbers via Five9 and Global Connect.  (See

26 FAC at ¶¶ 16-14 & 31).  Common questions include whether: (1) the dialers constitute "automatic

27 telephone dialing systems" pursuant to § 227(a)(1) of the TCPA; (2) USCB lacked "prior express

28 consent" for the calls where such calls were intended for other persons, or where USCB's records

do not reflect that consent had been obtained; and (3) the calls constitute unfair, unconscionable, or harassing conduct in connection with debt collection, in violation of the FDCPA and Rosenthal Act.  (See Motion at 15-16).  The Ninth Circuit recently affirmed a district court's finding of commonality in a case presenting almost identical common questions where consumers alleged violations of the TCPA.  See Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1041-42 (9th Cir. 2012), cert. denied, 133 S.Ct. 2361 (2013).  In another similar case, Malta v. Fed. Home Loan Mortgage Corp., 2013 WL 444619 (S.D. Cal. 2013), the court found that common questions of fact existed where plaintiffs alleged that defendant Wells Fargo made calls to class members "using auto-dialing equipment or with a prerecorded voice message[,]" and that common questions of law also existed, including "whether Wells Fargo negligently violated the TCPA;" "whether [it] willfully or knowingly violated the TCPA;" and "whether Wells Fargo had 'prior express consent' for the calls."  Id. at *2.  The same holds true here, and the commonality requirement is therefore satisfied.

### 3.    Typicality.

To demonstrate typicality, a plaintiff "must show that the named parties' claims are typical of the class."  Ellis, 657 F.3d at 984 (citing Fed. R. Civ. P. 23(a)(3)).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Id. (internal quotation marks and citation omitted).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  Id. (internal quotation marks and citation omitted); see Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014).  "The typicality requirement demands that a named plaintiff's claims be 'reasonably co-extensive with those of absent class members,' although 'they need not be substantially identical.'"  Avilez v. Pinkerton Gov't Servs., 286 F.R.D. 450, 456 (C.D. Cal. 2012) (quoting Hanlon, 150 F.3d at 1020).

Here, the claims of the named plaintiff are typical of the claims of the class since they arise from the same factual basis and are based on the same legal theory, i.e., defendant's alleged common practice of "using an [automated dialing system] and/or artificial or prerecorded voice"

1  to call the class members' cellular telephones without consent, thereby constituting a violation of

2  the TCPA, FDCPA, and Rosenthal Act.  See Brown v. NFL Players Ass'n., 281 F.R.D. 437, 442

3  (C.D. Cal. 2012) (typicality satisfied where plaintiff's claims were based on "the same event or

4  practice or course of conduct that [gave] rise to the claims of other class members and . . . are

5  based on the same legal theory.").  The court, moreover, is not aware of any facts that would

6  subject the class representative to "unique defenses which threaten to become the focus of the

7  litigation."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).  Rule 23(a)(3)'s

8  typicality requirement is therefore satisfied.

9  **4.    Adequacy of Representation.**

10     "The named Plaintiffs must fairly and adequately protect the interests of the class."  Ellis,

11  657 F.3d at 985 (citing Fed. R. Civ. P. 23(a)(4)).  "To determine whether named plaintiffs will

12  adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and

13  their counsel have any conflicts of interest with other class members and (2) will the named

14  plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Id. (internal

15  quotation marks and citation omitted).  "Adequate representation depends on, among other

16  factors, an absence of antagonism between representatives and absentees, and a sharing of

17  interest between representatives and absentees."  Id.

18     The proposed class representative, Jonsson, does not appear to have any conflicts of

19  interest with the other class members; she has no individual claims separate from the class claims.

20  (See, generally, FAC).  According to plaintiff, she filed this lawsuit "to obtain redress for [her]self

21  and the other consumers to whom Defendant made" prerecorded collection calls.  (See Motion,

22  Exh. A (Declaration of Plaintiff Brenda Jonsson in Support of Motion for Preliminary Approval of

23  Class Action Settlement) ("Jonsson Decl.") at ¶ 2).  Although she would have "benefitted

24  financially," plaintiff rejected an early individual settlement offer from USCB, and instead elected

25  to "risk the possibility that [she] would recover only a portion of what USCB had offered – or

26  nothing at all – by continuing to litigate on behalf of the class." (Id. at ¶ 4).  Plaintiff did so despite

27  the additional risk that she could be liable for attorney's fees and costs.  (See id.).  Under the

28  circumstances, the court is persuaded that "[t]he adequacy-of-representation requirement is met

here because Plaintiff[ has] the same interests as the absent Class Members[.]  Further, there is no apparent conflict of interest between the named [plaintiff's] claims and those of the other Class Members' – particularly because the named Plaintiff[ has] no separate and individual claims apart from the Class."  Barbosa, 297 F.R.D. at *442.

Additionally, the court is convinced that plaintiff's attorneys are competent and willing to prosecute this action vigorously.[2]  Plaintiff's attorneys "are devoted to advocating on behalf of consumers, and are experienced in consumer class actions and the claims asserted"  in this action.  (Motion at 17; see Raphael Decl. at ¶¶ 6-8 & 18-21; Motion, Exh. D (Declaration of Daniel J. Marovitch in Support of Preliminary Approval of Class Action Settlement) ("Marovitch Decl.") at ¶ 3); Motion, Exh. E (Declaration of Plaintiff's Attorney Amir J. Goldstein in Support of Motion for Preliminary Approval of Class Action Settlement) ("Goldstein Decl.") at ¶¶ 5-6).  Further, counsel have "vigorously, efficiently, and effectively pursued this case."  (Motion at 17; see Raphael Decl. at ¶¶ 22-53; Marovitch Decl. at ¶ 5).  Based on this evidence, the court is convinced that plaintiff's counsel are competent and willing to prosecute this action vigorously, and the adequacy-of-representation requirement is satisfied.  See Barbosa, 297 F.R.D. at 443 ("There is no challenge to the competency of Class Counsel, and the Court finds that Plaintiffs are represented by experienced and competent counsel who have litigated numerous class action cases."); Avilez, 286 F.R.D. at 457 ("Defendants do not dispute and the evidence confirms that, as detailed in their declarations, Plaintiff's counsel are experienced class action litigators who have litigated many wage and hour class actions and have been certified as class counsel in numerous other class actions, particularly wage and hour class actions.").  The court will therefore appoint plaintiff's counsel as class counsel.

B.    Rule 23(b) Requirements.

"Where, as here, a plaintiff moves for class certification under Rule 23(b)(3), the plaintiff must prove[] the questions of law or fact common to the members of the class predominate over

---

[2] Plaintiff's counsel includes Amir J. Goldstein, Lance A. Raphael, Stacy M. Bardo, and Daniel J. Marovitch.  (See Settlement Agreement at § B(11)).

1    any questions affecting only individual members, and that a class action is superior to other

2    available methods for the fair and efficient adjudication of the controversy." Sandoval, 2011 WL

3    5443777, at *2; see Fed. R. Civ. P. 23(b)(3).

4            **1.**    **Predominance.**

5          "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

6    cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623, 117 S.Ct. at 2249;

7    see Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 964 (9th Cir. 2013), cert. denied, 135 S.Ct.

8    53 (2014) ("[T]he predominance analysis under Rule 23(b)(3) focuses on the relationship between

9    the common and individual issues in the case, and tests whether the proposed class is sufficiently

10   cohesive to warrant adjudication by representation.") (internal quotation marks omitted). "Rule

11   23(b)(3) focuses on the relationship between the common and individual issues. When common

12   questions present a significant aspect of the case and they can be resolved for all members of the

13   class in a single adjudication, there is clear justification for handling the dispute on a

14   representative rather than on an individual basis." Hanlon, 150 F.3d at 1022 (internal quotation

15   marks and citations omitted); see Kelley v. Microsoft Corp., 395 F'Appx. 431, 432 (9th Cir. 2010)

16   ("[T]he main concern in the predominance inquiry . . . [is] the balance between individual and

17   common issues.") (internal quotation marks and citation omitted) (alterations in original). Further,

18   plaintiffs' "damages must be capable of determination on a classwide basis, and those damages

19   must be traceable to a plaintiff's 'liability case.'" Munoz v. PHH Corp., 2013 WL 2146925, *24

20   (E.D. Cal. 2013) (citing Comcast Corp. v. Behrend, 133 S.Ct. 1426 (2013)).

21         Here, the FAC sufficiently demonstrates that "[a] common nucleus of facts and potential

22   legal remedies dominates this litigation." Hanlon, 150 F.3d at 1022. As discussed above, see

23   supra at § I.A.2., there are common questions regarding the alleged practice of "using an

24   [automated dialing system] and/or artificial or prerecorded voice" to call the class members'

25   cellular telephone numbers via Five9 and Global Connect without consent. (See FAC at ¶¶ 16-14

26   & 31). Common questions include whether: (1) the dialers constitute "automatic telephone dialing

27   systems" pursuant to § 227(a)(1) of the TCPA; (2) USCB lacked "prior express consent" for the

28   calls where such calls were intended for other persons, or where USCB's records do not reflect

1    that consent had been obtained; and (3) the calls constitute unfair, unconscionable, or harassing

2    conduct in connection with debt collection, in violation of the FDCPA and Rosenthal Act.  The

3    central inquiry will be whether USCB violated the statutes at issue by making the alleged calls to

4    class members.  See Malta, 2013 WL 444619 at *4 (predominance requirement met where "[t]he

5    central inquiry [was] whether Wells Fargo violated the TCPA by making calls to the class

6    members"); Ritchie v. Van Ru Credit Corp., 2014 WL 956131, *2 (D. Ariz. 2014) (finding

7    predominance factor established in TCPA class action); see also Kamar v. Radio Shack Corp.,

8    254 F.R.D. 387, 399 (C.D. Cal. 2008) ("Class certification is usually appropriate where liability

9    turns on an employer's uniform policy that is uniformly implemented, since in that situation

10   predominance is easily established."); Barbosa, 297 F.R.D. at 444 (finding predominance where

11   "[t]he central issues raised by the complaint concern policies and practices of Defendant which

12   apply broadly to all the employees in the proposed settlement class" such as "policies that

13   allegedly required Class members to work . . . without compensation for meal and rest periods").

14        Finally, class members' individual damages are "capable of determination on a class-wide

15   basis, and those damages [are]  traceable to . . plaintiff[s'] 'liability case.'" Munoz, 2013 WL

16   2146925, at *24 (quoting Comcast, 133 S.Ct. at 1433); Leyva v. Medline Indus., Inc., 716 F.3d

17   510, 515 (9th Cir. 2013) ("[defendant's] own documents demonstrate the feasibility of calculating

18   damages in this case.  [Its] electronic payroll records contain much of the data needed to calculate

19   damages.").  For example, whether treble damages for willful or knowing violations, see 47 U.S.C.

20   § 227(b)(3), requires class-wide determination with respect to USCB's knowledge that it was

21   calling wrong numbers or persons for whom it lacked consent.  In short, the court is persuaded

22   that the predominance requirement is satisfied.

23             **2.    Superiority.**

24        "The purpose of the superiority requirement is to assure that the class action is the most

25   efficient and effective means of resolving the controversy." Wolin v. Jaguar Land Rover North

26   America, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (brackets and internal quotation marks

27   omitted).  "The superiority inquiry under Rule 23(b)(3) requires determination of whether the

28   objectives of the particular class action procedure will be achieved in the particular case" and

1  "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution."

2  Hanlon, 150 F.3d at 1023.  Rule 23(b)(3) provides a list of four non-exhaustive factors relevant to

3  superiority.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).

4  　　　　The first factor considers "the class members' interests in individually controlling the

5  prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  "This factor weighs

6  against class certification where each class member has suffered sizeable damages or has an

7  emotional stake in the litigation."  Barbosa, 297 F.R.D. at 444.

8  　　　　Here, plaintiff does not assert claims for emotional distress damages, nor is there any

9  indication that the amount of damages that any individual class member could recover is

10  significant.  (See, generally, FAC).  As plaintiff notes, the resolution of this case through individual

11  claims worth no more than approximately $500 would be cost-prohibitive for plaintiffs to litigate.

12  (See Motion at 20).  "Where recovery on an individual basis would be dwarfed by the cost of

13  litigating on an individual basis, this factor weighs in favor of class certification."  Wolin, 617 F.3d

14  at 1175; Leyva, 716 F.3d at 515 ("In light of the small size of the putative class members' potential

15  individual monetary recovery, class certification may be the only feasible means for them to

16  adjudicate their claims.  Thus, class certification is also the superior method of adjudication.");

17  Bruno v. Quten Research Inst., LLC, 280 F.R.D. 524, 537 (C.D. Cal. 2011), reconsideration

18  denied, 280 F.R.D. 540 (2012) ("Given the small size of each class member's claim, class

19  treatment is not merely the superior, but the only manner in which to ensure fair and efficient

20  adjudication of the present action."); Schwarm v. Craighead, 233 F.R.D. 655, 664 (E.D. Cal. 2006)

21  (finding FDCPA class action superior to individual claims because "[n]ot only are most individual

22  consumers unaware of their rights under the FDCPA, but also the size of the individual claims is

23  usually so small there is little incentive to sue individually") (internal quotation marks omitted).  In

24  short, "there is no evidence that Class members have any interest in controlling prosecution of

25  their claims separately nor would they likely have the resources to do so."  Munoz, 2013 WL

26  2146925, at *26.

27  　　　　The second factor to consider is "the extent and nature of any litigation concerning the

28  controversy already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  "The Court

1    does not have any information that litigation concerning this controversy is currently being pursued

2    by or against the class members; thus, this factor is neutral." Barbosa, 297 F.R.D. at 444.

3            The third factor is "the desirability or undesirability of concentrating the litigation of the

4    claims in the particular forum," and the fourth factor is "the likely difficulties in managing a class

5    action." Fed. R. Civ. P. 23(b)(3)(C)-(D). "In the context of settlement, however, the third and

6    fourth factors are rendered moot and are irrelevant." Barbosa, 297 F.R.D. at 444; Amchem, 521

7    U.S. at 620, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification,

8    a district court need not inquire whether the case, if tried, would present intractable management

9    problems, for the proposal is that there be no trial.") (citation omitted).

10           The only factor in play here weighs in favor of class treatment.  Further, the filing of

11   separate suits by several thousand class members "would create an unnecessary burden on

12   judicial resources." Barbosa, 297 F.R.D. at 445.  Under the circumstances, the court finds that

13   the superiority requirement is satisfied.

14   II.     FAIRNESS, REASONABLENESS AND ADEQUACY OF THE PROPOSED SETTLEMENT.

15           The court's preliminary evaluation of the Settlement Agreement "does not disclose grounds

16   to doubt its fairness[,] . . . such as unduly preferential treatment of class representatives or of

17   segments of the class, or excessive compensation for attorneys, and appears to fall within the

18   range of possible approval[.]" In re Vitamins, 2001 WL 856292, at *4 (quoting Manual for Complex

19   Litigation, Third, § 30.41 (West 1999)).

20           A.     The Settlement Is A Product Of Arms-Length Negotiations.

21           "This circuit has long deferred to the private consensual decision of the parties." Rodriguez

22   v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009).  The Ninth Circuit has "emphasized" that:

23                   the court's intrusion upon what is otherwise a private consensual agreement

24                   negotiated between the parties to a lawsuit must be limited to the extent

25                   necessary to reach a reasoned judgment that the agreement is not the

26                   product of fraud or overreaching by, or collusion between, the negotiating

27                   parties, and that the settlement, taken as a whole, is fair, reasonable and

28                   adequate to all concerned.

1   Id. (internal quotation marks omitted).

2      Plaintiff's Motion and supporting documents, and the overall record in this case, evidence

3   that the parties' settlement was reached through arms-length negotiations.  There is no evidence

4   or suggestion of  collusion or fraud leading to, or taking part in, the settlement negotiations

5   between the parties.  According to plaintiff, the Settlement Agreement was the result of "months

6   of extensive first and third-party discovery, numerous arms-length negotiations between counsel,

7   two formal, all-day mediations with experienced third-party neutrals, and an October 16, 2014

8   hearing before this Court[.]"  (Motion at 1).  The parties first participated in a day-long mediation

9   session before neutral Howard S. Fredman.  (See Raphael Decl. at ¶ 41).  While the mediation

10  was unsuccessful, it "opened a continuing settlement dialogue."  (Id.).  Following the first

11  mediation, plaintiff filed the FAC, adding the Rosenthal Act claim and expanding the class

12  definition based on call records produced in the litigation.  (See id. at ¶¶ 34 & 42).

13     Given the uncertainties of timing of FCC declaratory rulings relating to the TCPA,[3] the

14  potential size of the class, the potential limits on recovery due to USCB's $3,000,000 insurance

15  policy limit, with a "burning limit provision," which means "the cost of defense would be taken out

16  to reduce the overall policy limits available to recompense the class[,]" and USCB Chief Financial

17  Officer's declaration that USCB "lacked the financial wherewithal to contribute significant amounts

18  to any potential class judgment or settlement[,]" (Raphael Decl. at ¶¶ 25 & 43; see Motion, Exh.

19  C (Declaration of Victoria Sterman Regarding USCB, Inc.'s Financial Status For Class Settlement

20  ("Sterman Decl.") at ¶¶ 2 & 9-10)), the parties agreed to attend a second mediation session.  (See

21  Raphael Decl. at ¶ 43).  This session, which lasted all day, was conducted before Judge West

22  (ret.).  (See id. at ¶ 44).  The parties reached an agreement during this session, (see id. at ¶ 45),

23  

24     [3] On May 16, 2014, USCB filed a Motion to Stay Litigation Pending FCC Declaratory Rulings
    ("Stay Motion"), contending that the FCC is currently considering several petitions addressing (1)
25  whether the TCPA applies to non-telemarketing calls; (2) whether equipment that lacks the current
    capacity for random or sequential number generation constitutes an automated telephone dialing
26  system; and (3) whether telephone calls to alleged "wrong numbers" are a violation of the TCPA
    if the caller had a reasonable belief the number belonged to the party they intended to call.  (See
27  Stay Motion at 5-6).  USCB subsequently withdrew the Stay Motion.  (See Notice of Withdrawal
28  of Motion for Stay of Action Docket No. 51).

and negotiated for six additional weeks the terms of the Settlement Agreement.  (See id.).  A settlement reached through the assistance of a mediator and through a several-week long process to finalize the settlement supports a determination that the settlement process was not collusive.  See Carter v. Anderson Merchandisers, LP, 2010 WL 1946784, *7 (C.D. Cal. 2010) ("The Court is . . . satisfied the Settlement Agreement is the product of arms-length negotiation" because the settlement was reached through "formal mediation sessions presided over by an experienced mediator[.]").

The record further supports the conclusion that the settlement was reached through arms-length negotiation.  The parties zealously litigated this action and engaged in extensive motion and discovery practice.  For instance, plaintiff engaged in "extensive written and oral discovery[,]" (Raphael Decl. at ¶ 25), which included the "exchange[ of] thousands of pages of communications, manuals, contracts, and other relevant documents," (id. at ¶ 33); the production of "call records and other supporting documents[,]" by Five9 and Global Connect in response to subpoenas, (id. at ¶ 34); and the deposition of Global Connect.  (See id. at ¶ 35).  For its part, USCB took the deposition of plaintiff.  (See Jonsson Decl. at ¶ 3).  The parties also briefed USCB's motion to stay the litigation pending the FCC's rulings in pending petitions for declaratory ruling.  (See Stay Motion; Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Stay).  Thus, the parties entered the settlement discussions with a substantial understanding of the factual and legal issues from which they could advocate for their respective positions.  See Collins v. Cargill Meat Solutions Corp., 274 F.R.D. 294, 302 (E.D. Cal. 2011) (finding arms-lengths negotiations where "[b]oth parties conducted extensive investigation and discovery allowing them to assess the strengths and weaknesses of the case."); Adoma, 913 F.Supp.2d at 977 (finding settlement to be fair and a result of arms-length negotiation where the parties engaged in formal written discovery and deposition).  In short, the court finds that the parties sufficiently "consider[ed] the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it[.]"  Rodriguez, 563 F.3d at 965.

Based on the evidence and record before the court, the court is persuaded that "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating

1   parties[.]"  Rodriguez, 563 F.3d at 965 (quoting Hanlon, 150 F.3d at 1027).

2       B.   The Amount Offered In Settlement Falls Within The Range Of Possible Judicial

3           Approval And Is A Fair And Reasonable Outcome For Class Members.

4       The settlement amount of $2,750,000 is fair, reasonable, and adequate, and falls within a

5   range of possible approval.  The settlement fund is approximately 91% of USCB's insurance policy

6   limit, (see Motion at 25; Raphael Decl. at ¶¶ 25 & 53), and "[g]iven USCB's inability to pay

7   substantially beyond the limits of insurance – and the fact that the $3 million policy will continue

8   to deplete with additional defense costs – it is doubtful that the Class would benefit significantly

9   more, if at all, even if Plaintiff were successful at trial."  (Motion at 25; see Sterman Decl at ¶ 10).

10  USCB's Chief Financial Officer declares that "[b]ecause of USCB's financial status, it is unable to

11  contribute to any class action settlement beyond its current $250,000 contribution toward defense

12  costs without running the risk of going out of business."  (Sterman Decl. at ¶ 10).  As noted above,

13  see supra at § II.B., plaintiff estimates that after deducting court-approved attorney's fees and

14  costs, an incentive award for the class representative, and the costs of claims administration, each

15  class member will receive an award between $47 and $158, based on an estimated claim rate of

16  3% to 10%.  (See Motion at 12 & 26; Raphael Decl. at ¶ 52).  As plaintiff notes, "even the lowest

17  estimated $47 amount anticipated for each [class member] is within reason for a TCPA class

18  action."  (Motion at 26); see Rose v. Bank of America Corp., 2014 WL 4273358, *10 (N. D. Cal.

19  2014) (noting that the "$20 to $40 range falls in the lower range of recovery achieved in other

20  TCPA class action settlements"); Knutson v. Schwan's Home Service, Inc., 2014 WL 3519064,

21  *4 (S.D. Cal. 2014).

22      Further, "[t]he fact that [the] proposed settlement may . . .  amount to a fraction of the

23  potential recovery does not, in and of itself, mean that the proposed settlement" is inadequate.

24  Linney v. Cellular Alaska P'ship., 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks

25  and citation omitted); see In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000)

26  (ruling that "the [s]ettlement amount of almost $2 million was roughly one-sixth of the potential

27  recovery, which, given the difficulties in proving the case, [was] fair and adequate.").  The range

28  of individual awards here falls within the range of previously approved settlement amounts in

other, similar cases.  See, e.g., Bellows v. NCO Fin. Sys., Inc., 2008 WL 4155361, *3 (S.D. Cal. 2008) ("[e]ach Class Member who makes a timely and accepted claim shall be entitled to receive a $70 settlement check"); Sarabri v. Weltman, Weinberg & Reis Co., L.P.A., 2012 WL 3991734, *3 (S.D. Cal.), report and recommendation adopted, 2012 WL 3809123 (S.D. Cal. 2012) (same); Lo v. Oxnard European Motors, LLC, 2011 WL 6300050, *5 (S.D. Cal. 2011) ("The Settlement Agreement requires Defendant to place $49,100.00 into a settlement fund, from which class members will have the right to make a claim to receive, at a minimum, approximately $131.69."); Knutson, 2014 WL 3519064, at *4 (preliminarily approving settlement in which maximum benefit to class members was $20 and an $80 voucher and collecting cases with $20-$100 in estimated recovery per class member).

Plaintiff also recognizes that the FDCPA and Rosenthal Act claims were vulnerable to findings that "USCB's calls did not violate the FDCPA's prohibitions against harassing, unfair, or unconscionable collection activity, [and] (2) that such violations were nonetheless subject to the FDCPA's 'bona fide error' defense[.]" (Motion at 24 n. 9).  Moreover, there was the added risk that even it plaintiff were to prevail on the merits, "it is possible, if not likely, that [a large award] would be reduced – and would not be remotely collectable from Defendant based [on] its actual financial status."  (Id. at 25; see Sterman Decl. at ¶ 10).  In light of the risks and uncertainty to plaintiff and the class in moving forward to prove liability and damages before a trier of fact, especially given the issue of consent and USCB's contention that Five9 and Global Connect "do not constitute 'automatic telephone dialing systems' under § 227(a)(1) of TCPA[,]" (Motion at 23-24), the court finds that $2.75 million settlement amount is a fair and adequate recovery for the class.

Finally, as plaintiff points out, "USCB is implementing changes to prevent further alleged violations of the TCPA's prohibition against autodialed or prerecorded calls to cell phone without consent."  (Motion at 13).  The Settlement Agreement requires USCB to partner, for a five year period, with a company that employs realtime scrubbing services on all telephone numbers placed into a call database to determine whether a number is a cellular phone number.  If the telephone number is determined to be a cellular phone number, the company will analyze whether the name on the debtor account assigned for collection is the same name associated with its scrub results.

If the names do not match, USCB will remove the number from its dialing system.  (See Settlement Agreement at § D(2)).  Of course, the settlement value is enhanced by defendant's agreement to alter its practices to ensure that automated calls to cellular telephone numbers are not made without a recipient's consent.  (See id.).  Thus, the settlement not only compensates class members for alleged past violations, it also gives due regard to protecting their rights under the TCPA in the future.  See Malta, 2013 WL 444619 at *7 ("In addition, the class members will benefit from Wells Fargo's new procedures to ensure future compliance with the TCPA by eliminating calls made to cellular telephones unless the account-holder's servicing record is systematically coded to reflect the borrowers prior express consent to receive calls on his or her cell phone."); Grant v. Capital Mgmt. Servs., L.P., 2013 WL 6499698, *5 (S.D. Cal. 2013) ("Although the settlement does not include monetary relief for the class, it stops Defendant's allegedly unlawful practices, bar[ring] Defendant from similar practices in the future[.]"); Bellows, 2008 WL 4155361 at *3 (preliminary approval granted where settlement agreement included injunctive-type relief); Sarabri, 2012 WL 3991734 at *4 (same); see also Officers, 688 F.2d at 624 ("The primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties.").

For the reasons set forth above, the court is persuaded that the Settlement Agreement's terms and total payment amount are fundamentally fair, reasonable and adequate, and that the settlement falls within the range of possible approval.

C.   The Settlement Agreement Does Not Improperly Grant Preferential Treatment To The Class Representative.

**1.   The Incentive Award Does Not Provide Unduly Preferential Treatment To The Class Representative.**

"Although [the Ninth Circuit] ha[s] approved incentive awards for class representatives in some cases, [it has instructed] district courts to scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." Radcliffe v. Experian Info. Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013).  Here, the Settlement Agreement provides for an incentive award of "no more than $10,000" to plaintiff "for her work in, among other things, aiding in the

1  prosecution of the case, providing evidence and responding to written discovery, sitting for a

2  lengthy deposition, attending mediation and participating in negotiations between the Parties, and

3  serving as representative of the Settlement Class." (Settlement Agreement at § D(1)(b)).

4         In Radcliffe, the court cast doubt, but did not rule on, "whether class representatives could

5  be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value

6  when they would receive $5,000 incentive awards." 715 F.3d at 1165. In Staton, the court

7  reversed the district court's approval of a class-action settlement where the incentive payments

8  of up to $50,000 were disproportionately large when compared to class members' payments

9  averaging $16,500 for one subclass, and $1,000 for another. See 327 F.3d at 948-49, 977. The

10 Staton court cautioned that class representatives receiving special incentive awards "may be more

11 concerned with maximizing those incentives than with judging the adequacy of the settlement as

12 it applies to class members at large." Id. at 977. In such cases, "the class representatives [may

13 not] adequately represent the class." Radcliffe, 715 F.3d at 1164.

14        The Staton court, however, approvingly cited to Cook v. Niedert, 142 F.3d 1004, 1016 (7th

15 Cir. 1998), in which the Seventh Circuit allowed an incentive payment of $25,000 "in the context

16 of a recovery of more than $14 million[,]" where the plaintiff "spent hundreds of hours with his

17 attorneys and provided them with 'an abundance of information[.]'" 327 F.3d at 976 (quoting Cook,

18 142 F.3d at 1016). Staton also cited favorably to In re SmithKline Beckman Corp. Sec. Litig., 751

19 F.Supp.525, 535 (E.D. Pa. 1990), which approved "$5,000 awards for one named representative

20 of each of nine plaintiff classes involving more than 22,000 claimants in a settlement of $22

21 million[.]" 327 F.3d at 977.

22        With this guidance in mind, the court must examine whether there is a "significant disparity

23 between the incentive awards and the payments to the rest of the class members" such that it

24 creates a conflict of interest. See Radcliffe, 715 F.3d at 1165. Further, "[i]n deciding whether [an

25 incentive] award is warranted, relevant factors include the actions the plaintiff has taken to protect

26 the interests of the class, the degree to which the class has benefitted from those actions, and the

27 amount of time and effort the plaintiff expended in pursuing the litigation." Cook, 142 F.3d at 1016.

28        The court first considers whether an incentive award of $10,000 is unduly disproportionate

to the benefits likely to be received by the absent class members.  Here, the actual cash payment per class member is estimated to be between $47 and $158.  (See Motion at 12; Marovitch Decl. at ¶ 6).  While a large disparity exists between the incentive payment and the average monetary payment, the court does not believe, under the circumstances here, that such disparity rises to the level of unduly preferential treatment.  First, courts have approved similar or greater disparities between incentive awards and individual class member payments.  For example, in Cox v. Clarus Marketing Group, LLC, 291 F.R.D. 473, 483 (S.D. Cal. 2013), the court approved a $5,000 incentive award where class members would receive a maximum payment of $36.  See also Fulford v. Logitech, Inc., 2010 WL 807448, *3 n. 1 (N.D. Cal. 2010) (collecting cases awarding incentive payments ranging from $5,000 to $40,000); Grant, 2014 WL 888665, at *4 & 8 (approving $5,000 incentive award in a TCPA class in which only injunctive relief was provided).

Second, plaintiff submits evidence supporting the adequacy of the incentive payment based on the amount of time spent and burden carried by the class representative, and the benefits she provided to counsel and the class as a whole throughout the litigation.  See Cook, 142 F.3d at 1016.  The proposed class representative spent more than 30 hours assisting counsel in the prosecution of this case. (See Jonsson Decl. at ¶ 10).  Plaintiff states that she "gathered evidence and aided [her] attorneys' pre-suit investigation by answering questions, obtaining phone records, compiling recordings of USCB's prerecorded messages left on [her] voicemail, and taking screenshots of Defendant's calls on [her] cell phone." (Id. at ¶ 3).  According to plaintiff, she "fully cooperated in discovery" by compiling documents, traveling to and from her home in Long Beach and Los Angeles, via public transportation, "to attend an all-day deposition in Los Angeles," which was "preceded by several hours of preparation with counsel the day before and [her] own independent preparation before that." (Id.).  Plaintiff also traveled to Los Angeles to "participate in an all-day mediation[.]" (Id.).  Significantly, USCB made an individual settlement offer to plaintiff at the outset of the case, which had she accepted, would have benefitted her financially "without having to expend the additional time and effort [she] ultimately put into litigating this Action on behalf of the other consumers whom USCB called." (Id. at ¶ 4).  She understood the risk of "recover[ing] only a portion of what USCB had offered – or nothing at all – by continuing to litigate

on behalf of the class." (Id.).  In sum, plaintiff's evidence establishes that the incentive award is warranted based on her effort to "protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." Cook, 142 F.3d at 1016.

> **2.      The Incentive Payment Is Not Conditioned On The Class Representative's Support of the Settlement**.

In Radcliffe, the court reversed approval of a class action settlement because the "conditional incentive awards caused the interests of the class representatives to diverge from the interests of the class because the settlement agreement told class representatives that they would not receive incentive awards unless they supported the settlement." 715 F.3d at 1161.  Here, it does not appear that the incentive award is conditioned on plaintiff's support of the settlement.

D.      The Settlement Agreement Has No Obvious Deficiencies.

District courts have the duty and authority to protect the interests and rights of class members as well as to ensure the "integrity of the settlement approval process." Hanlon, 150 F.3d at 1025.  When the parties appeared before the court on October 16, 2014, the court expressed concern over certain language in the original Settlement Agreement.  The parties have sufficiently cured the deficiencies identified by the court.  (See, generally, Settlement Agreement.).

E.      Proposed Class Notice And Notification Procedures.

Upon a settlement of a certified class, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2) requires the "best notice that is practicable under the circumstances, including individual notice" of particular information.  Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 113 (2d Cir.), cert. denied, 544 U.S. 1044 (2005).  A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."

1  Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir.), cert. denied, 543 U.S. 818 (2004)

2  (internal quotation marks omitted).  The notice must "fairly apprise the prospective members of

3  the class of the terms of the proposed settlement and of the options that are open to them in

4  connection with the proceedings." Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982), cert.

5  denied, 464 U.S. 818 (1983) (internal quotation marks and brackets omitted); see Trotsky v. L.A.

6  Fed. Sav. & Loan Ass'n., 48 Cal.App.3d 134, 151-52 (1975) (same); Wershba v. Apple Computer,

7  Inc., 91 Cal.App.4th 224, 252 (2001) ("As a general rule, class notice must strike a balance

8  between thoroughness and the need to avoid unduly complicating the content of the notice and

9  confusing class members.").  The notice should provide sufficient information to allow class

10  members to decide whether they should accept the benefits of the settlement, opt out and pursue

11  their own remedies, or object to its terms.  See Wershba, 91 Cal.App.4th at 251-52.  "[N]otice is

12  adequate if it may be understood by the average class member."  4 Newberg on Class Actions §

13  11:53, at 167 (4th ed. 2013).

14      Here, the proposed notice program provides for Direct Mail Notice, defined as "a single-

15  postcard summary notice that will be sent via U.S. Mail, postage prepaid[,]" (Settlement

16  Agreement at § B(17)), the Website Notice, Long Form Class Notice, and Media Notice

17  (collectively, "Class Notice").  (See id. at § B(12) & H).  The Class Notice describes the nature of

18  the action, including the class claims. (See Settlement Agreement, Exh. A (Direct Mail Notice) at

19  2; Long Form Class Notice at 2); see Fed. R. Civ. P. 23(c)(2)(B)(I) & (iii).  The class definition is

20  conspicuously included in a section entitled, "Am I a  Class Member?" on the Direct Mail Notice,

21  (see Direct Mail Notice at 1), and "How do I know if I am a part of the settlement" on the Long

22  Form Class Notice. (See Long Form Class Notice at 2); see Fed. R. Civ. P. 23(c)(2)(B)(ii).  The

23  Class Notice explains the terms of the Settlement Agreement, including the monetary benefits

24  class members will receive. (See Direct Mail Notice at 1; Long Form Class Notice at 3).  It

25  includes an overview and detailed explanation laying out the class members' options under the

26  settlement: they may submit a claim form and receive a check, exclude themselves, object, or do

27  nothing. (See Direct Mail Notice at 1; Long Form Class Notice at 3-4); see Fed. R. Civ. P.

28  23(c)(2)(B)(v)-(vi). The Settlement Agreement and Class Notice provide that class members may

elect to exclude themselves from the settlement by writing a letter to the claims administrator stating to the effect, "I want to be excluded from the Settlement Class" or submitting an exclusion request form, which will be available on the settlement website.  (See Settlement Agreement at § I & Exh. A (Exclusion Request Form); Direct Mail Notice at 2; Long Form Class Notice at 4).  The Class Notice also states that if class members choose to object to the settlement, they may do so by submitting written objections to the court, and attending the Final Approval Hearing.  (See Direct Mail Notice at 2; Long Form Claim Form at 5); see Fed. R. Civ. P. 23(c)(2)(B)(iv).  The Class Notice also explains that all members of the settlement class will release all claims that relate to the claims or issues asserted in the lawsuit.  (See Direct Mail Notice at 2 (advising release of "right to bring . . . own lawsuit against USCB for the same facts alleged in this case"); Long Form Class Notice at 4); see Fed. R. Civ. P. 23(c)(2)(B)(vii).  Information regarding the Final Approval Hearing is also included.  (See Direct Mail Notice at 2; Long Form Class Notice at 5).

The Settlement Agreement provides for Direct Mail Notice to be sent via first class mail within 30 days following entry of an order granting preliminary approval of the Settlement Agreement.  (See Settlement Agreement at § H(2)).  The Settlement Agreement also provides a procedure reasonably designed to reach all individuals who would be bound by the settlement.  (See id. at §§ H(2)-(4)).  That procedure includes requiring the proposed claims administrator, Kurtzman Carson Consultants ("KCC") to (1) administer a  website containing a copy of the Settlement Agreement, the FAC, Direct Mail and Long Form Class Notice, the claim form, an exclusion form, the order granting preliminary approval, the petition for an incentive award and attorney's fees and costs when filed, and other information relating to the Settlement Agreement and claims process, (see id. at § H(3)), and (2) supplement the Direct Mail Notice via internet banner ads and a press release.  (See id. at § H(4)).

Based on the foregoing, the court finds that there is no alternative method of distribution that would be more practicable here, or any more reasonably likely to notify the class members.  Under the circumstances, the court finds that the procedure for providing notice and the content of the class notice constitute the best practicable notice to the class members.

**This Order is not intended for publication.  Nor is it intended to be included in or**

**submitted to any online service such as Westlaw or Lexis.**

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Plaintiff's Motion for Preliminary Approval of Class Action Settlement **(Document No. 70)** is **granted** upon the terms and conditions set forth in this Order.

2.  The court preliminarily certifies the class, as defined in § C(1) of the Class Action Settlement Agreement ("Settlement Agreement") (Document No. 70-1) for purposes of settlement.

3.  The court preliminarily appoints plaintiff Brenda Jonsson as class representative for settlement purposes.

4.  The court preliminarily appoints Lance Raphael and Stacy Bardo of the Consumer Advocacy Center, P.C., Dan Marovitch of the Marovitch Law Firm, LLC, and Amir Goldstein of the Law Offices of Amir J. Goldstein as class counsel for settlement purposes.

5.  The court preliminarily finds that the terms of the proposed Settlement Agreement are fair, reasonable and adequate, and comply with Rule 23(e) of the Federal Rules of Civil Procedure.

6.  The proposed manner of the notice of settlement set forth in the Settlement Agreement constitutes the best notice practicable under the circumstances and complies with the requirements of due process.

7.  The Court approves the form, substance and requirements of the class notice and forms, annexed as Group Exhibit A, to the Settlement Agreement.

8.  The parties shall carry out the settlement according to the terms of the Settlement Agreement.

9. Kurtzman Carson Consultants ("KCC") is hereby appointed as the Claims Administrator. Promptly following entry of this order, KCC will prepare final versions of the class notice and related forms, incorporating into them the relevant dates and deadlines set forth in this Order and the Settlement Agreement, and will commence the notice process, in accordance with Settlement Agreement.

10.  The deadlines for class members to file requests for exclusion and objections to the

settlement shall be in conformity with the Settlement Agreement.  Any class member may submit objections to and, upon request, may be excluded from the settlement by submitting an Exclusion Request Form or writing a letter to the claims administrator stating to the effect, "I want to be excluded from the Settlement Class," no later than forty-five (45) days after the Class Notice is first disseminated, and as further instructed in the class notice and Exclusion Request Form.

11.  A final approval (fairness) hearing is hereby scheduled for **May 21, 2015,** at **10:00 a.m.** in Courtroom 22, to consider the fairness, reasonableness and adequacy of the Settlement Agreement as well as the award of attorney's fees and costs to class counsel, and service awards to the class representatives.

12.  Plaintiff shall file and serve a motion for final approval of the Settlement Agreement no later than **April 16, 2015**, and notice it for hearing for the date set forth above.

13.  If any opposition or objection to the Settlement Agreement has been filed, then the parties shall, no later than five (5) court days before the final approval hearing, file, jointly or separately, a reply in support of the motion for final approval of the Settlement Agreement.

14.  Plaintiff shall file a motion for an award of class representative service payment and attorney's fees and costs pursuant to, and in accordance with, the terms of the Settlement Agreement and no later than **April 16, 2015**, and notice it for hearing for the date set forth above.

15.  If any opposition or objection to the motion for an award of class representative service payment and attorney's fees and costs has been filed, then the parties shall, no later than five (5) court days before the final approval hearing, file a reply in support of the motions for an award of class representative incentive payments and attorney's fees and costs.

Dated this 26th day of January, 2015.

_____
Fernando M. Olguin
United States District Judge

29